


**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED

**TAWANA C. MARSHALL, CLERK**
**THE DATE OF ENTRY IS**
**ON THE COURT'S DOCKET**



**The following constitutes the ruling of the court and has the force and effect therein described.**

_/s/ Stacey G. C. Jernigan_

**Signed September 16, 2008**                                    **United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| IN RE: | § |
| | § |
| WHITE NILE SOFTWARE, INC., | §     CASE NO. 08-33325-SGJ-11 |
| | § |
| | § |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW
### REGARDING ORDER DISMISSING CASE

Came on to be heard this 2nd day of September, 2008, Steven Thrasher's Motion: i) for Abstention; ii) to Dismiss; or iii) to Appoint Chapter 11 Trustee (the "Motion"). The Court, having separately entered its order abstaining and dismissing this case (the "Dismissal Order") (See Docket No. 35) makes the following findings of fact and conclusions of law pursuant to F.R.B.P Rule 7052(a)(1), as incorporated by F.R.B.P. Rule 9014(c) in support of the Dismissal Order.

### FINDINGS OF FACT

With respect to the background of the ongoing dispute and litigation among Messr. Mandel, Thrasher and others:

1. White Nile was formed in July 2005 by Edward Mandel and Steven Thrasher, with the intention that it would be used to create a certain type of search engine for the Internet. Messrs. Thrashers and Mendel met in 2001 or 2002.

2. Mr. Thrasher, was stated by Mr. Mandel, as being his patent lawyer on certain projects prior to White Nile's formation.

3. Mr. Mandel and Mr. Thrasher had been, at all pertinent times, the majority shareholders of White Nile. Mr. Mandel is currently the CEO of White Nile, and is its sole remaining director.

4. Mr. Mandel is also an officer, director, and principal shareholder of the company called NeXplore.

5. Stock certificates admitted into evidence show that in October 2005, Messrs. Mandel and Thrasher were each issued 26 million shares of White Nile stock, respectively, and an individual named Paul Williams was issued 2.5 million shares of White Nile stock.

6. Further, while the evidence is unclear on this point, it appears that Eddy and Ellen Layne made or intended to make a $300,000 investment in White Nile, and the intention or the reality may have been to issue the Laynes 75,000 shares of White Nile stock in exchange for such investment.

7. The Laynes' son, Skinner Layne, was formerly an employee of White Nile and a director.

8. Skinner Layne reserved nexplore.com as a domain name in December 2005, shortly after Eddy and Ellen Layne apparently made their $300,000 investment.

9. Unfortunately, White Nile never got very far along in its strategic plans. While Mr. Mandel invested between $10,000 and $30,000 in White Nile between July and October 2005, in the form of trips taken to get White Nile off of the ground, and although White Nile retained some consultants and entered into some non-compete agreements with certain key people that were to be involved, soon after White Nile was formed, disputes arose between the two majority shareholders, Messrs. Mandel and Thrasher.

10. By January 16, 2006, Messrs. Mandel and Thrasher had reached what appeared to be irreconcilable differences, and Mr. Mandel and two other directors, Paul Williams and Skinner Layne, held a directors' meeting, declaring that White Nile was no longer a going concern and that various non-compete agreements that White Nile had entered into would be released.

11. The same three individuals, on January 11, 2006, signed corporate documentation purporting to remove Mr. Thrasher from his offices with White Nile.

12. Around this exact same time, on January 17, 2006, a new entity, NeXplore Technologies, was formed by Skinner Layne, in which Skinner Layne was named as sole director and in which Mr. Mandel, Paul Williams, and Skinner Layne became shareholders. Eddy and Ellen Layne apparently also became investors. NeXplore, through later transactions, became a public company. Mr. Mandel is now NeXplore's CEO, and Paul Williams and Skinner Layne were also officers of NeXplore.

13. Mr. Thrasher takes the position that NeXplore has exploited the same concepts and intellectual property that did belong or were intended to belong to White Nile. Mr. Mandel has taken the position that NeXplore created the concept for a search engine that is completely different

from what was being designed at White Nile.

14. These disputes and related disputes have been the subject of litigation pending primarily in the 14th District Court for Dallas County, Texas, before Judge Mary Murphy, styled White Nile Software, Inc. v. Steven Thrasher, Cause No. 063319.

15. At one point in that litigation, in October 2007, it appears from the evidence there was either a settlement or a near-settlement announced on the record in Judge Murphy's court. That purported settlement, which Mr. Mandel now disputes, involved Mr. Thrasher being transferred or awarded the intellectual property of White Nile, with NeXplore paying for certain licensing rights in the intellectual property.

16. Unfortunately, this settlement or near-settlement, depending on whom you believe, quickly unraveled for reasons that are in dispute, and yet more litigation ensued thereafter, some before Judge Murphy and some in the federal courts before Judge Solis and Judge Godbey that was short-lived.

17. In any event, the litigation in Judge Murphy's court has been put on hold by White Nile's filing of this Chapter 11 case in 2008.

## FACT FINDINGS RELEVANT TO THE DISMISSAL

With the foregoing background, the relevant facts for the purpose of the dismissal order are as follows:

1. White Nile currently has no operations and has not had any operations for many months.

2. White Nile has no employees.

3. White Nile has had no income since its creation. Specifically, White Nile never developed to fruition the intellectual property concepts that it had.

4. White Nile has no tangible, real, or personal property other than a few thousand dollars in cash, most or all of which is being held by lawyers as retainers, and most or all of which was loaned to the company just shortly before the bankruptcy so that White Nile could, in fact, retain lawyers.

5. White Nile's only assets are some disputed intellectual property rights, including rights evidenced by patent applications and provisional patents which it has valued at $60,000 on its balance sheet filed in its Chapter 11 case, and also some disputed derivative claims asserted against and by Steven Thrasher for breach of fiduciary duty, malpractice, and possibly other torts, which White Nile has valued at $50,000 on its balance sheet filed in its case.

6. White Nile has no executory contracts nor unexpired leases.

7. With regard to creditors, White Nile has listed in its schedules only one secured creditor, Lance Barron, the individual who loaned White Nile $60,000 shortly before the bankruptcy filing so that it would have funds to pay lawyers to represent it. Mr. Barron apparently took a security interest in the intellectual property of White Nile to secure his loan.

8. White Nile lists no priority debt.

9. White Nile lists only nine unsecured creditors to whom it believes it is obligated, and only two of these creditors -- Current Communications, owed $30,000, and KBA Group, LLP, the Debtor's former accountants, who is owed $500 -- are not either shareholders, affiliates, or other insiders of White Nile or lawyers for the parties in the state court litigation.

10. Schedule F lists $579,000 of unsecured claims owing to the nine unsecured creditors: $307,000 of which is allegedly owed to Mr. Mandel; $49,000 of which is owed to Mr. Mandel's other company, NeXplore; $80,000 of which is owed to presumptive shareholders Eddy and Ellen Layne; $29,000 of which is owed to former director Paul Williams; $20,000 of which is owed to Jason Coleman, a former consultant; and $10,000 of which is owed to Rod Martin, a former consultant.

11. These are all likely insiders under the Bankruptcy Code definition of "insider," but without a doubt they are mostly parties or shareholders of parties in the state court litigation before Judge Murphy.

12. Mr. Mandel says that the strategy for this Chapter 11 case would be for there to be a sale of whatever intellectual property exists in White Nile to NeXplore or to a higher bidder. NeXplore would offer, as a stalking horse bidder, $100,000 to $200,000, depending on the terms of the sale. Mr. Mandel asserts that this process would be for the benefit of creditors. But the Court finds that this is an illusion, or a Potemkin village in the days of Catherine II, as Mr. Keiffer might put it.

13. Here, there are extremely few creditors -- again, except for mostly parties to the state court litigation or shareholders of the parties to the state court litigation, and lawyers. Chapter 11 is expensive and complex business, and the Court sees no one who would genuinely benefit from it here, since, again, all but two relatively insignificant creditors are parties or shareholders of parties in the state court litigation or otherwise likely insiders.

14. The stalking horse bid price suggested for NeXplore would barely be enough to pay

administrative expense claims plus the secured claim of Lance Barron, if it indeed is secured.

15. Any transaction would appear to be a shell game of paying Peter to pay Paul to pay Peter, since Lance Barron, the purported secured creditor of White Nile, is also a shareholder to NeXplore, and Mr. Mandel, and, again, other significant creditors of White Nile are the Laynes, all three of them, who are also shareholders in NeXplore.

16. The White Nile Chapter 11 case would not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions. It would be about changing the forum for the ongoing litigation among Messrs. Mandel and Thrasher and the other folks who have been drug into their disputes. The Court sees no good reason to let this happen.

**CONCLUSIONS OF LAW**

1. This Court has jurisdiction in this contested matter pursuant to 28 U.S.C. Section 1334. This is a core proceeding pursuant to 28 U.S.C. Section 157(b).

2. The Court believes that the applicable legal authority that should guide the Court here is Section 305, rather than Section 1112 or 1104 of the Bankruptcy Code, which have also been argued as alternative bases for relief.

3. Section 305 authorizes a Bankruptcy Court, after notice and a hearing, which we have had here, to dismiss a case or abstain from hearing it if the Court finds that the interests of creditors and the debtor would be better served by dismissal or suspension.

4. Various courts have elaborated that, in considering what is in the interests of creditors and the debtor, such things as fairness and the importance of discharge to the debtor should be

considered. Also, access of the parties to a pending state court forum, if there has been state court litigation that is significant, and whether there are a small number of creditors, and the necessary complexity of the bankruptcy process, and efficiency and economy of administration. Also, whether there are preferences or other avoidance actions that might only be dealt within the Bankruptcy Court forum.

5. Here, again, we have no known preferences or fraudulent transfers to consider. We have no potential discharge in a case of a corporate debtor who would be liquidating. We have very few creditors.

6. The state court is not an inconvenient forum to the Debtor or creditors, it being just down the street. And it appears, frankly, that anything and everything that might be accomplished in this bankruptcy case can more efficiently and economically be handled in the state court.

7. In fact, it appears that this Chapter 11 filing was an attempt to avoid that state court process, when there was a state court judge much more well-versed in this dispute than this Court currently is. This case appears to be about starting over with the intellectual property disputes that have been in play for many months.

8. This Court has authority under Sections 109 and 350 of the Bankruptcy Code, if it believes there is cause, to make a dismissal with prejudice.

9. The Court finds that a good argument for cause has been made, and so the Court is going to dismiss this case with prejudice to any refiling in any venue for 180 days. The cause would be the many facts found, the main fact being that this was about forum-shopping and restarting litigation to avoid what had already been underway in the state court.

# # # End of Order # # #

**SUBMITTED BY:**

E. P. Keiffer
**WRIGHT GINSBERG BRUSILOW P.C.**
**The Elm Place Building**
**1401 Elm Street, Suite 4750**
**Dallas, Texas 75202**
**Phone:  (214) 651-6517**
**Fax:     (214) 744-2615**
**E-mail:  pkeiffer@wgblawfirm.com**

**ATTORNEYS FOR STEVEN THRASHER**


**Approved as to form only**

**Mark H. Ralston**
**THE RALSTON LAW FIRM**
**2603 Oak Lawn Avenue**
**Suite 230, L B 2**
**Dallas, Texas 75219**
**Phone: (214) 295-6416**
**Fax: (214) 281-8720**
**E-mail: ralstonlaw@gmail.com**

**PROPOSED ATTORNEYS FOR THE DEBTOR**